## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Jamal Antwon Knowles, | ) | |
|      Petitioner, | ) | |
| | ) | |
| v. | ) | No. 1:24cv1290 (RDA/WBP) |
| | ) | |
| Commonwealth of Virginia, | ) | |
|      Respondent. | ) | |

### MEMORANDUM OPINION

Petitioner Jamal Antwon Knowles ("Petitioner" or "Knowles"), a Virginia prisoner proceeding *pro se,* filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his February 18, 2021 convictions for first-degree murder, arson of an occupied dwelling, and grand larceny in the Circuit Court of the City of Norfolk, Virginia. Dkt. No. 1. On December 9, 2024, Respondent filed a Rule 5 Answer and a Motion to Dismiss with supporting briefs and exhibits. Dkt. Nos. 18–20. On December 10, 2024, in accordance with *Milla v. Brown*, 109 F.4th 222 (4th Cir. 2024), the Court advised Knowles of his right to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). Dkt. No. 21. Knowles responded with a pleading entitled "Motion to Grant Habeas Corpus Relief and Award New Trial." Dkt. No. 25. The matter is thus ripe for disposition and, for the reasons that follow, Respondent's Motion to Dismiss will be granted and the petition dismissed with prejudice.

### I. Procedural History

Knowles is detained pursuant to final orders of the Norfolk Circuit Court dated February 18, 2021. Dkt. No. 20-1 at 1-6. At the end of his five-day jury trial, which ended on October 19, 2020, Knowles was convicted of: (i) first-degree murder, in violation of Virginia Code § 18.2-32; (ii) arson of an occupied dwelling, in violation of Virginia Code § 18.2-77; and (iii) grand larceny, in violation of Virginia Code § 18.2-95. *Id.* at 7-10. Knowles was acquitted of defiling a dead

human body. *Id.* at 9. Knowles was sentenced to thirty years in prison on the murder conviction, two years in prison on the grand larceny conviction, and five years in prison on the arson conviction, for a total of thirty-seven years. *Id.* at 1-6.[1]

Knowles, by counsel, filed a petition for appeal to the Court of Appeals of Virginia that raised two assignments of error:

1.  The trial court erred in denying the appellant's motion to strike the charges of first degree murder and arson because the circumstantial evidence presented by the Commonwealth failed to prove the appellant committed these offenses.

2.  The trial court erred in denying the appellant's motions to exclude from admission into evidence the appellant's federal court document and telephone call because the probative value of the evidence was substantially outweighed by its unfair prejudice.

Dkt. 20-2 at 9. The Court of Appeals of Virginia denied Knowles' petition for appeal on March 18, 2021. Dkt. 20-3 at 13-24. The order denying the petition for appeal summarized the evidence as follows:

Before June 18, 2019, Demont Brooks lived alone [in an apartment on] Picadilly Street, . . . in Norfolk. Brooks owned a silver 1999 Toyota Avalon with a Virginia license plate number UUH-2855. Brooks's cell phone had a number with the last four digits "7371." Brooks customarily kept his phone with him at all times.

At 8:17 a.m. on June 18, 2019, Norfolk firefighters arrived at the scene of a reported fire at Brooks's apartment. Smoke was emanating from the stairwell to the apartment building and became stronger near the door of Brooks's apartment. After forcing open the locked door, firefighters found Brooks's dead body face down on a futon in the living room. Brooks's body was naked. There was smoke and a heavy amount of soot in the apartment, but no open fire. The smell of gasoline permeated the apartment. In the back bedroom of the apartment, the drawers had been pulled out of a dresser and the room was in disarray.

Kenny Harlan, an investigator for the Norfolk Fire Marshal's office, found no evidence of fire or a fire source outside Brooks's apartment building. The heaviest area of burning in the apartment was to an entertainment center in the living room. A plastic shelving unit near the entertainment center had been consumed by fire. A second fire had occurred in a kitchen drawer which was stuffed with paper towels.

---

[1] The transcripts, orders, pleadings, and exhibits are included in the manuscript record provided by the state circuit court clerk and references to that record are designated, "R. at ___;" and references to the transcripts are designated "Tr. at ___." If the parties have attached portions of the state court records to their respective pleadings, those references may be designated by the corresponding docket numbers.

The curtains in the main area of the apartment also had burned; the burned curtains had dropped onto a plastic container on the floor and, as a result, burned through the lid of the container.

In the three areas of burning inside the apartment, Harlan found no evidence of accidental cause for the fires. The fires were limited to the three areas and did not become widespread because of insufficient oxygen; as a result, the fire "smoldered itself out by the time the fire department arrived on the scene." Testifying as an expert in fire investigation, Harlan opined that the three fire areas were intentionally set and were not accidental. Harlan could not determine the precise time that the fire had been set.

Notwithstanding the presence of the fire inside Brooks's apartment, the autopsy revealed, due to the absence of soot in the lungs or an elevated level of carbon monoxide in his system, that his death preceded the fire. The cause of Brooks's death was multiple blunt force trauma to the right side of the head. There were ten separate injuries to Brooks's head. The trauma had caused fractures to Brooks's skull, contusions to the brain, and brain hemorrhages. Brooks's body was covered in soot on the back side, and it smelled of gasoline.

After Brooks's body was discovered, the police determined that Brooks's car was missing from its customary parking place outside the apartment building. A surveillance camera situated on Picadilly Street showed Brooks's Toyota moving down the street at 6:26 a.m. on June 18, 2019. The car was equipped with a GPS device allowing the lienholder on the vehicle, which was a used car dealership, to locate it. Using the GPS device with the assistance of the dealership, the police learned that at 9:06 a.m. on June 18, 2019, Brooks's car was located on Grandy Road in Grandy, North Carolina.

Allen Gillard lived [on] Grandy Road in Grandy, North Carolina, on June 18, 2019. That day, appellant appeared at Gillard's house between 7:00 and 8:00 a.m. Appellant arrived at Gillard's house in a silver sedan; appellant said he had bought the car for his girlfriend. Appellant asked to store the car at Gillard's house. Appellant took a shower and changed clothes, then left at about 1:30 p.m. Appellant mentioned that he was going to try to get a cell phone.

Consistent with the "pings" manually administered by the dealership to the GPS device on Brooks's car, a surveillance camera video recorded the Toyota at the drive through window of a McDonalds restaurant in Grandy, North Carolina, at 1:24 p.m. on June 18, 2019. Surveillance cameras later photographed appellant inside a convenience store that was a fifteen to twenty-minute drive from the McDonalds location. The police subsequently received updated information from the car dealership through manual updates with the GPS device and determined that at 1:43 p.m. Brooks's car was progressing north toward Virginia.

Police officers near the border of Virginia and North Carolina spotted Brooks's car, with only a driver and no apparent passengers, traveling north on Route 168 toward Chesapeake. The police followed the Toyota in unmarked vehicles. Surveillance camera footage showed Brooks's vehicle moving through a toll plaza without stopping at 2:34 p.m. After the toll plaza, the Toyota accelerated to 115 miles per

hour and took an exit ramp at Hanbury Road. The police, with lights and sirens activated, pursued the Toyota.

The Toyota reentered the highway and crossed a median into oncoming traffic. Brooks's car collided head on with another vehicle on the southbound shoulder of Route 168. The driver of the Toyota abandoned the car and fled down the steep embankment at the side of Route 168.

When police officers reached the location of the wreck, they jumped over the guardrail, proceeded down the embankment, crossed a creek, and climbed over a barbed wire fence. After searching through the woods for fifty to seventy-five yards, the police apprehended appellant hiding beneath a fallen tree. Appellant complained of pain in his leg, and he was transported to the hospital for medical treatment.

In appellant's pocket, the police found three debit cards bearing Brooks's name, as well as a Navy Federal Credit Union gift card. On the driver's seat of the wrecked vehicle, the police found a key on a key chain with a cigarette lighter attached. The key unlocked the door to Brooks's apartment. Two wallets were in the side pocket of the driver's door of the car. One of them contained appellant's Virginia identification card, and the other wallet was empty.

A gray ZTE cell phone was in the center console of the car. A second cell phone, which was a Kyocera phone, was in a black bag on the front passenger seat. A lug wrench was on the floor of the front passenger seat. On the backseat of the Toyota was a backpack containing a wallet with a Visa card bearing appellant's name, a letter addressed to appellant at an address on Leo Street in Norfolk, and a folded piece of paper with "Property of Jamal Knowles" written on the outside.

Forensic examination of the Kyocera cell phone showed that it had not been used since 2015. The ZTE cell phone had been activated on June 18, 2019, and had been used to place calls that day. The lack of prior activity on the ZTE phone tended to indicate that it was new. Some of the calls made on the ZTE phone were placed to Ashley Brown, appellant's cousin, with whom he resided on Leo Street.

The records of Brooks's cell phone indicated that, on the night before the fire was discovered, Brooks's phone had traveled to the vicinity of Leo Street in Norfolk, then returned to the area of Picadilly Street, where the phone remained until about 6:00 a.m. on June 18, 2019. Analysis of the records pertaining to Brooks's cell phone, which the police never recovered, showed that it was in the vicinity of the Picadilly Street location where Brooks's car was photographed at 6:26 a.m. on June 18, 2019, and, later, in Grandy, North Carolina. However, there was no service or activation to Brooks's phone detected on appellant's path north from North Carolina to Virginia, supporting the conclusion that the phone was either turned off or destroyed.

DNA collected from Brooks's penis was foreign to him, but the DNA sample was insufficient to establish a profile. Brooks's fingernail clippings showed the presence of male DNA foreign to him. Laboratory testing confirmed that gasoline was present on rug samples collected from Brooks's apartment and on the futon

where Brooks's body was found. A bleach bottle containing gasoline was recovered from the floor of the bedroom in Brooks's apartment. Gasoline also was present on one of the shoes appellant was wearing at the time of his arrest.

In front of the burned entertainment center, the police found a packet of papers on the floor near Brooks's feet. The three pieces of paper, which were stapled together, bore appellant's name. The documents were from the United States District Court for the Eastern District of Virginia and were issued on June 10, 2019. In a criminal proceeding in which appellant was named as the defendant, he was summoned to appear in court on June 28, 2019. The documents introduced into evidence at appellant's trial were redacted and did not reflect the type of offense involved in the proceeding. When the police questioned appellant after his arrest at the hospital on June 18, 2019, he said that he bought the Toyota from a man named "Billy" at about 12:00 p.m. that day.

Appellant claimed that he had driven around Norfolk in the car all day and that he had not stopped anywhere. Appellant denied that he had traveled to North Carolina that day. Appellant further denied knowing Brooks. When asked if he had been on Picadilly Street, appellant did not respond.

On June 25, 2019 at 11:22 a.m., while in jail after his arrest, appellant placed a telephone call to a female. The Commonwealth introduced a full recording of the call, which was admitted without objection, but was not played for the jury. Later during the trial, the Commonwealth introduced a transcript of excerpts from the call, in which appellant made the following statements:

• "I have been to the guy's house, so it may be little traces of me there."

• "I have an extracurricular activity, hobby I like to do and that's what keeps me closed up & [sic] closed off to myself because the way people look at people who participate in that activity I participate in, I don't like to be boxed in because I'm different but I still shoulda been more open with you."

• "I do not condone that homosexual shit."

• "The dude with the situation I'm involved with, he had some homosexual shit around him."

Dkt. No. 20-3 at 14-18.

Knowles, by counsel, filed a petition for appeal in the Supreme Court of Virginia that raised the same two assignments of error. The court refused the petition on April 29, 2022. Dkt. No. 20-4 at 9, 35.

On November 9, 2022, Knowles, proceeding *pro se*, filed a petition for a writ of habeas corpus in the Norfolk Circuit Court, Dkt. No. 21, which raised the following claims:

a. Trial counsel was ineffective for filing a motion to withdraw.

5

b. Counsel was ineffective for failing to conduct adequate pretrial investigation to wit:

i. Counsel failed to object to chain of custody;

ii. Counsel failed to move to suppress chain of custody;

iii. Counsel "allowed court papers bearing defendant's name . . . to enter evidence showing defendant as a defendant in federal proceeding";

iv. The Commonwealth's discovery shows victim was found naked, lying face down with skin discoloration to his back and buttocks area/region;

v. Knowles brought to trial counsel's attention these facts and shared the idea to investigate if any "DNA" was found on the victim (the use of bleach was an attempt to destroy evidence);

vi. Counsel failed to investigate forensic findings that DNA was found on victim;

vii. Discovery from the Commonwealth showed DNA from the defendant and suspect Demetrius Davis and a Y Chromosome was found;

viii. Discovery from the Commonwealth shows no DNA was found on the victim;

ix. Discovery shows items 1-46 introduced by Norfolk Fire and Rescue. Items 31, 44, and 45 were never shared by Commonwealth in violation of *Brady v. Maryland*;"[2]

x. Defense counsel failed to investigate missing items;

xi. At trial Forensic Scientist testified that two Y chromosomes were found on rectum of victim;

xii. Knowles claims that this evidence was new and was not shared in discovery. A penile swab and finger clippings were all that was shared. Counsel should have investigated beyond just reviewing file of prosecutor;

xiii. Counsel failed to investigate reasonable line of questioning;

xiv. Counsel failed to request a recess or continuance to investigate the two Y chromosomes;

xv. Counsel's "lack of awareness" caused counsel to fail to inquire if DNA on victim belonged to someone of interest;

xvi. Due to counsel's failure to investigate forensic evidence petitioner was unable to present reliable rebuttal evidence;

xvii. Due to counsel's ineffectiveness "the fact of bleach being used along with finding of two DNA's would have created a broken link suggesting someone else was responsible for this crime;

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

6

xviii. Commonwealth did not pursue defiling of corpse because use of bleach along with DNA would create with broken link; and

xix. Counsel was ineffective for failing to present the facts as well as the use of bleach and presence of DNA on victim;

c. Counsel was ineffective for failing to call forth evidence and witnesses in petitioner's favor:

i. Affidavit of Jarod Knowles (petitioner's brother who would have testified that he had two running vehicles and his brother had access to one if he needed it);

ii. Petitioner told counsel about witnesses Keisha Lubin and Jarrod Knowles and explained why he needed them.

Dkt. No. 21. The Circuit Court granted the Respondent's motion to dismiss on October 30, 2023.

Dkt. No. 20-1 at 11-36. Knowles did not appeal that dismissal to the Supreme Court of Virginia.

**II. Federal Petition**

On July 12, 2024,[3] Knowles, proceeding *pro se*, filed his current federal habeas petition,

pursuant to 28 U.S.C. § 2254, which raises the following grounds for relief:

1.   Counsel provided ineffective assistance of counsel by:

    a.   failing to conduct a pre-trial investigation, Dkt. No. 1 at 5, 22;

    b.   failing to know facts of case, *id.* at 5-7;

    c.   failing to challenge Knowles' opportunity to commit arson, *id.* at 2-3, 5, 16, 21-22, 32-34;

    d.   denying Knowles a defense, *id.* at 5;

    e.   failing to call witnesses that had factual information, *id.* at 3, 5-7, 24-26;

    f.   failing to share that DNA was found on the victim, *id.* at 3-4, 5, 8, 18-20, 30-32, 35;

    g.   failing to learn that DNA had been on the victim, *id.* at 3-4, 5, 8, 18-20, 30-32, 35;

    h.   failing to challenge the Commonwealth's theory of motive, *id.* at 5; and

---

[3] Knowles petition was stamped by the prison mail room as received on July 12, 2024. Dkt. No. 1-2 at 1. *See Houston v. Lack*, 487 U.S. 266, 276 (1988); *see also* R. 3(d), Rules Governing Section 2254 Cases in the United States District Courts ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing.").

      i.    failing to introduce the pre-trial transcripts at trial, *id.* at 5; 16-17, 21, 23, 29.

2.      Trial counsel failed to call forth witnesses and present facts to aid defense. *Id.* at 3, 6-7.

3.      The DNA discovered on the victim was not compared to persons of interest *Id.* at 3-4, 8, 18-20, 31-32, 35). Neither the trial counsel nor Knowles were aware before trial that the DNA did not match Knowles. *Id.* at 8.

4.      No attorney was provided to assist in effort to assemble original state habeas corpus petition and the law library was not accessible. *Id.* at 5-6, 9, 11.

### III. Exhaustion and Procedural Default

Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in the appropriate state court, *see* 28 U.S.C. § 2254(b); *Granberry v Greer*, 481 U.S. 129 (1987), which requires that a state prisoner "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A Virginia petitioner must have presented the same factual and legal claims raised in his § 2254 petition to the Supreme Court of Virginia. *Kasi v. Angelone*, 300 F.3d 487, 501-02 (4th Cir. 2002); *see, e.g., Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). A claim has not been "fairly present[ed]" for exhaustion purposes if the claim is raised in "a procedural context in which its merits will not be considered." *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

Exhaustion requires a petitioner to raise a "claim at each level of state court review," which includes his initial post-conviction petition before the trial court, and again on appeal. *Smith v. Gaetz,* 565 F.3d 346, 352 (7th Cir. 2009); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To

provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in *each* appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.") (emphasis added); *Jones v. Sussex I State Prison*, 591 F.3d 707, 712-13 (4th Cir. 2010) ("To provide the state with this opportunity, the prisoner must fairly present his claim in each appropriate state court . . . , thereby alerting that court to the federal nature of the claim. The habeas petitioner must raise his claim before every available state court, including those courts—like the Supreme Court of Virginia—whose review is discretionary." (internal quotations and citations omitted)

"A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) (citation omitted). Importantly, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas review of the defaulted claim." *Id.* (citation omitted). Such a claim is technically exhausted, but procedurally defaulted.

Exhaustion requires that "'both *the operative facts* and the controlling legal principles'" upon which a petitioner relies must have been presented to the state court for review. *Kasi*, 300 F.3d at 501-02 (emphasis added) (quoting *Matthews*, 105 F.3d at 911). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") emphasized the importance of exhausting facts by limiting federal habeas "review under § 2254(d)(1) . . . to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see Muhammad v. Clarke*, No. 1:11cv345, 2012 WL 259869, *4 (E.D. Va. Jan. 26, 2012) (where a petitioner attempts to allege unexhausted facts, the federal court must defer to the state court's finding) (citing *Kasi*, 300 F.3d at 501-02; *Pinholster*, 563 U.S. at 182-83), *appeal dismissed*, 474

F. App'x 979 (4th Cir. 2012). *Pinholster* emphasized this portion of AEDPA and held "that the record under review is limited to the record in existence at that same time—*i.e., the record before the state court.*" *Id.* (emphasis added). The Fourth Circuit echoed this point in *Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018) finding that the reasonableness of a state court decision is evaluated "'in light of the evidence presented in the State court proceeding.'" *Id.* at 443 (quoting *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015)).[4]

Finally, because the exhaustion requirement "refers only to remedies still available at the time of the federal petition, it is satisfied," even if the petitioner never raised the claims at issue in state court, "if it is clear that [the habeas petitioner's] claims are now procedurally defaulted under [state] law." *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) (internal quotation marks and citations omitted). "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Id.* at 162; *see also Baker*, 220 F.3d at 288.

With respect to Claims 1(a) through 1(i) and Claim 2, the claims alleging ineffective assistance of counsel, Knowles failed to raise any of these claims in the Supreme Court of Virginia. Knowles failure to appeal the state circuit court's dismissal of his state habeas petition rendered those claims defaulted and barred federal habeas review of any of the claims raised in the state habeas petition. *See Whitley v. Bair*, 802 F2d 1487, 1502 (4th Cir. 1989) ("Failure to appeal claims

---

[4] *Pinholster* explained that

[w]hat makes the consideration of new evidence strange is not how "different" the task would be, but rather the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed. We cannot comprehend how exactly a state court would have any control over its application of law to matters beyond its knowledge.

563 U.S. at 183 n.3.

disposed of by a state habeas trial court constitutes a procedural bar to further federal review of such claims."); *see also Wise v. Williams*, 982 F.2d 142, 146 (4th Cir. 1992) (affirming district court's finding that state habeas claim was procedurally defaulted due to prisoner's failure to timely file his notice of appeal). Thus, those claims cannot now be asserted and will be dismissed.

Further, with regard to any claim not raised in state court, if Knowles attempted to raise such claims by way of a state habeas petition now, each claim would be barred by the Virginia habeas statute of limitations, Virginia Code § 8.01-654(A)(2), and Virginia's bar on successive habeas petitions, Virginia Code § 8.01-654(B)(2). As both the Virginia statute of limitations and the Virginia successive petition bar are adequate and independent state procedural rules barring federal habeas review, the claims would be deemed simultaneously exhausted and defaulted. *See Pope v. Netherland*, 113 F.3d 1364, 1372 (4th Cir. 1997) (Virginia Code § 8.01-654(B)(2) is independent and adequate state law default); *Sparrow v. Dir., Dep't of Corr.*, 439 F. Supp. 2d 584, 588 (E.D. Va. 2006) (Virginia Code §§ 8.01-654(A)(2) and 8.01-654(B)(2) are independent and adequate state law defaults). A claim that could have been raised at trial and pursued on appeal would also be defaulted pursuant to *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), which bars collateral review of issues that could have been raised on appeal, such as sentencing. *Prieto v. Zook*, 791 F.3d 465, 468 (4th Cir. 2015) (finding sentencing issue defaulted pursuant to *Slayton*, which precluded federal habeas review, absent cause and prejudice or miscarriage of justice exceptions) (citing *Mu'Min v. Pruett*, 125 F.3d 192, 196-97 (4th Cir. 1997)); *Reid v. True*, 349 F.3d 788, 805 (4th Cir. 2003) (citing *Wright v. Angelone*, 151 F.3d 151, 159-60 (4th Cir. 1998)). Because procedural default bars review of these claims, they will be dismissed.

Knowles remaining claims, Claims 3 and 4 are also defaulted. Claim 3, which alleges that neither trial counsel nor Knowles knew prior to trial that DNA did not match Knowles and that it

was error for alleged DNA samples to be compared to a person of interest, was not raised on direct appeal to the Supreme Court of Virginia.[5] Likewise, Knowles did not raise Claim 4, complaining that he was not provided an attorney or access to the library during his state habeas corpus proceedings or by petition for appeal to the Supreme Court of Virginia. Accordingly, these claims are also defaulted and will be dismissed.

In sum, all of the claims in the federal petition are defaulted and therefore, absent cause and prejudice, they are barred from review in federal habeas. Therefore, Claims 1(a) through 1(i) and Claims 2, 3 and 4 are defaulted and will be dismissed.

### IV. Cause and Prejudice

Federal courts may not review defaulted claims absent a showing of cause and prejudice, or a fundamental miscarriage of justice such as actual innocence. *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) ("To overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice' if the federal court were to decline to hear his claim.") (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). The existence of cause ordinarily turns upon a showing of (1) a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. *Clozza v. Murray*, 913 F.2d 1092, 1104 (4th Cir. 1990); *Coleman*, 501 U.S. at 753 ("'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him . . . .") (citation omitted); *Farabee v. Johnson*, 129 F. App'x 799, 802 (4th Cir. 2005) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)) (applying *Carrier* to a procedural default caused by a petitioner while unrepresented by counsel). For example, "a showing that the

---

[5] Ineffective assistance of counsel claims related to these claims were raised in the Circuit Court. *See generally* Dkt. Nos. 20-1 and 21 (State Habeas Exhibit 5, 6, and 7, State Habeas Claims (B)(10), (B)(12) through (B)(16)). Further, as discussed *infra* at 24, this claim is factually baseless.

factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." *Carrier*, 477 U.S. at 488 (internal quotation marks and citations omitted). Importantly, a court need not consider the issue of prejudice in the absence of cause. *See Kornahrens v. Evatt*, 66 F.3d 1350, 1359 (4th Cir. 1995).[6]  Here, the factual and legal basis for Knowles' federal habeas Claims 1 through 4 were available to him during either his direct appeal and/or his state habeas proceeding. As such, Knowles cannot "show cause for the default" on this ground.[7]

Although Knowles does not rely on the narrow exception established by *Martinez v. Ryan*, 566 U.S. 1 (2012) as cause to excuse his defaulted claims of ineffective assistance of trial counsel, the Court has nonetheless considered the application of that exception and determined that none of Plaintiff's ineffective assistance of counsel claims satisfy *Martinez*'s requirement that the claim be "substantial."[8]  *Id.* at 14. The question of whether a claim is "substantial" is governed by *Strickland v. Washington*, 466 U.S. 668 (1984), and a petitioner bears the burden of showing that his counsel's performance was deficient and that as a result, he suffered prejudice. *See Sigmon v. Stirling*, 956 F.3d 183, 199 (4th Cir. 2020) (to establish a "substantial" claim a petitioner "must demonstrate that [his] underlying ineffective assistance of counsel claim is substantial with reference to *Strickland*'s two familiar prongs."); *Owens v. Stirling*, 967 F.3d 396, 423 (4th Cir.

---

[6] To show "prejudice," a petitioner must show an alleged constitutional violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

[7] Indeed, Knowles does not assert cause for his defaults in his response to the motion to dismiss. Dkt. No. 25.

[8] *Martinez* held that a federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the cause for default consists of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding.

2020) (to satisfy that a claim is substantial under *Martinez*, a habeas petitioner must show that the claim "has some merit, with respect to both prongs of *Strickland*").

> [A] petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. *Murray*, 477 U.S. at 486 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1263 (11th Cir. 2014). For a petitioner to establish a substantial claim a petitioner "must show that no competent counsel, in the exercise of reasonable judgment, would have omitted" the claim. *Id.* at 1263. As set forth herein, Knowles fails to demonstrate that any of his defaulted ineffective assistance of trial counsel claims were "substantial," thus he can show not satisfy *Martinez*'s narrow exception.

A.    Claims 1(a), 1(b), 1(c), 1(d), 1(e), 1(h), and 1(i)

Claims 1(a), 1(b), 1(c), 1(d), 1(e), 1(h), and 1(1) are similar in nature as they allege that trial counsel did not conduct a pre-trial investigation; did not know the facts of the case regarding the fire, firefighters, and the timeline of events; denied him witnesses; failed to challenge the prosecution's theory that Knowles did have the opportunity to commit the murder and arson; denied him "a defense;" did not challenge the prosecution's lack of a motive; and did not use the preliminary hearing transcripts "to investigate/question firefighters." Dkt. No. 1 at 2-3, 5, 16, 22-26, 32-34. These seven components of Claim 1 concern counsel's alleged lack of investigation and therefore knowledge about the "facts of the case," *id.* at 5, as well as her overall strategy, and will be addressed together.[9]

---

[9] Respondent addressed the lack of merit for each claim under the AEDPA regime. The Court is addressing Knowles ineffective assistance of counsel claims under the *Strickland* standard. Further, if Knowles' claims fail to establish a claim of ineffective assistance of counsel, the claim cannot be substantial for purposes of excusing a default under the narrow exception for cause recognized in *Martinez*. *See Owens*, 967 F.3d at 423.

Knowles' petition, primarily, presents argument and speculation, and is without sufficient facts to support his claims that trial counsel's alleged actions or alleged omissions were unreasonable and/or prejudicial. For example, he has "questions" that he wanted trial counsel to ask the firefighters—"How big was the fire? How long do you think the fire was going? Was an accelerant used? How long would it take to make this fire big? How would this fire be different if the fire was set at 6:26 a.m.?" *Id.* at 23. Knowles, however, does not provide a proper proffer of the answers to his questions, and he repeats this fatal error with almost all of his allegations. Moreover, these questions were actually answered by the testimony at trial, which Knowles chooses to ignore.[10]

In his petition, Knowles alleges counsel failed to interview the first firefighter on the scene, which he alleges prejudiced him because he left the scene at 6:26 a.m. and was deprived of "an 'estimate' of the damage that (2) hours of burning would have caused;" counsel "never explored" Knowles' questions for the firefighters because she told him this was a "murder charge"; counsel did not investigate pre-trial, which allegedly would have shown that he lacked the time, means, place, and opportunity; counsel did not obtain the preliminary hearing transcripts to investigate the arson because the time frame (6:26 a.m. through 8:13 a.m.) was "a 'Big' time frame to have a fire going with gasoline to speed up the damage"; counsel failed to investigate witnesses; counsel did

---

[10] Fire Marshal Harlan testified that there were three *small* fires, which self-extinguished; smoldered themselves; and that the electrical components were all functioning. In short, the fire was not big. The fire was already out when the firefighters arrived at approximately 8:17 a.m. The evidence establishes, as well as Knowles frequent admissions in his state and federal habeas litigation, that he left the scene at 6:26 a.m., which means the fire and subsequent smoldering from lack of oxygen lasted a period of under two hours—even though the undisputed evidence established that gasoline was used, unsuccessfully, as an accelerant. Harlan testified that he smelled gasoline throughout the apartment and testing established the presence of gasoline as well. The fire was never going to get big because the closed windows and doors deprived the three *small* fires self-extinguished due to a lack of oxygen. Again, the facts indicate that Knowles set the fire to cover his murder of the victim and theft of his car and other property, and Knowles fled in the victim's car at 6:26 a.m. Further, the three *small* fires, no matter when they were set, self-extinguished due to a lack of oxygen. Trial counsel was present and reasonably determined that it would have not helped her defense of Knowles to emphasize points that did not favor him.

not "enter the preliminary [hearing] transcripts into the court of record as evidence." *Id.* at 22-24.[11] As with the state court petition, the allegations in the federal petition are conclusory and do not warrant habeas relief, or they are disproved by the record.[12] *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992) (bald assertions and conclusory allegations are insufficient to support habeas relief), *overruled on other grounds as recognized in Yeatts v. Angelone*, 166 F.3d 255, 261 n.4 (4th Cir. 1999); *see also United States v. Dyess*, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding that the district court may disregard "vague and conclusory allegations" in habeas petitions and review only claims "supported by facts and argument").

In addition, Knowles has failed to establish the required prejudice to state a claim under *Strickland*.

> When a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, we require "a specific proffer . . . as to what an expert witness would have testified." *Goins v. Warden, Perry Corr. Inst.*, 576 F. App'x 167, 173 (4th Cir. 2014) (per curiam). *A petitioner's failure to do so "reduces any claim of prejudice to mere speculation and is fatal to his claim." Id.* (emphasis added); *see also Bassette v. Thompson*, 915 F.2d 932, 940 (4th Cir. 1990) ("The great failing of the appellant on his claim that other evidence should have been presented during the sentencing phase of his trial is the absence of a proffer of testimony from a witness or witnesses he claims his attorney should have called"); *Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n

---

[11] The record resolves Knowles allegations. First the fire did not "burn" for two hours. When the firefighters arrived at 8:17 a.m., the call to the fire department was received at 8:12 a.m. (less than two hours after Knowles admits leaving at 6:26 a.m. Dkt. No. 25 at 2, 3), there was no fire, no heat, only smoke. Tr. at 170. Firefighter Davis, first on the scene and to enter the apartment, testified that the fire had "self-extinguished, we did not apply any water." *Id.* at 172. The evidence revealed that someone had poured gasoline at various places in the apartment, that there were three places in the apartment where intentional fires had been set, and that all of the fires self extinguished from a lack of oxygen due to the closed windows and door. *Id.* at 225-26. Fire Marshall Harlan testified that the fire "could have been burning for maybe 30 or 40 minutes. It could be less. It just depends on how much oxygen was available. It's really hard to determine exactly in that situation." *Id.* at 229. There was no definitive testimony regarding when the fire started or how long it burned. The testimony at trial established that this was not a big fire, the electrical system was still operational; the fire did not burn for two hours, as it had "self-extinguished" before the firefighters arrived; and the fire did not burn very long, despite gasoline being used, because it self-extinguished due to a lack of oxygen. In sum, the answers to Knowles' questions were provided during the testimony at trial. Counsel did not need to ask questions that had already been asked, and *she did ask* the question about how long the fire had burned.

[12] *See* Dkt. No. 20-1 at 21-22, 25-27, 28, 30, 31-32, 32-33, 33-34.

allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced").

*Vandross v. Stirling*, 986 F.3d 442, 452 (4th Cir. 2021).[13] The Fourth Circuit, relying on *Bassette*, applied the same rule to inadequate investigations holding that "an allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced." *Beaver* 93 F.3d at 1195 (citing *Bassette*, 915 F.2d at 940-

---

[13] To the extent Knowles now seeks to rely on the alleged testimony of his brother Jarard, who allegedly would have testified that Knowles "was allowed to use [Jarard's] vehicle," Tr. at 240, this matter was discussed at trial. Knowles told the trial judge that he had been "dissatisfied" with trial counsel the first day of trial "because [he] wasn't aware of [trial counsel] conversing with [his] witnesses. But today [he had spoken] with [his] witnesses, and [he was] currently satisfied with her service. . . . [because] [y]esterday [he had spoken] with [his] witnesses." *Id.* at 239. Knowles, after the prosecution rested and in open court with the prosecutor and trial judge present, admitted that he had discussed his right to testify with counsel and after a private conversation with trial counsel (that lasted about 80 minutes), trial counsel informed the court that the defense was not putting on any evidence and that Knowles had decided not to testify. *Id.* at 780-81. The trial judge asked Knowles if that "was correct," and Knowles answered, "Yes sir." *Id.* at 782. *Hammond v. Hall*, 586 F.3d 1289, 1327 (11th Cir. 2009) (collecting cases and holding that counsel was not ineffective for pursuing a trial strategy that "had the support and permission of his client"); *Lobosco v. Thomas*, 928 F.2d 1054, 1057 (11th Cir. 1991) (finding no ineffective assistance where defendant "was fully informed of, [and] consented to," defense counsel's strategy of using closing argument to concede the defendant's guilt and begin building a case for mercy based on his contrition); *United States v. Weaver*, 882 F.2d 1128, 1140 (7th Cir. 1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel."); *United States v. Williams*, 631 F.2d 198, 204 (3d Cir. 1980) (no ineffective assistance existed because the defendant ultimately concurred in his trial counsel's tactical decision); *see also Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir. 1990) (en banc) (citation omitted) ("decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guess by hindsight."); *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991) (decision as to which witnesses to call as an aspect of trial tactics that is normally entrusted to counsel.).

Lastly, the two "affidavits" by Jarard attached to the federal petition are acknowledged, but not sworn; and there is no affidavit from Keisha Lubin. *See United States v. Terry*, 366 F.3d 312, 316 (4th Cir. 2004) (observing that where a petitioner faults counsel for not calling a witness, the petitioner should provide "concrete evidence of what [the witness] would have testified to in exculpation"); *Bassette*, 915 F.2d at 941 (failure to proffer potential testimony is fatal to *Strickland* claims); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony or affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). Jarard's first "affidavit" states that Knowles "had access to my Infinity whenever he needed it," and that trial counsel never called him. Dkt. No. 1 at 53. The second, states that Knowles' "had access to use Keisha Lubin's vehicle" and that trial counsel did not call him. *Id.* at 54. Jarard's statement that trial counsel never called him is contradicted by Knowles own statement to the trial judge, recounted above, indicating that he had spoken to his witnesses, learned that trial counsel had in fact talked with his witnesses, and then he affirmed that counsel's statement that the defense would not be putting on any evidence and Knowles had decided not to testify was correct. Tr. at 239-241. Further, neither Lubin's nor Jarard's "affidavits" are exculpatory as Knowles admits he was driving the victim's car at 6:26 a.m. that morning: "Defendant left the area at 6:26 a.m. GPS and video confirms it." Dkt. No. 26 at 3; *see also* Dkt. Nos. 1 at 33 (the defendant "left the area at 6:26 a.m." which was his "last opportunity to commit arson"); and 5 at 3 ("The Defendant was video taped leaving the area at 6:26 a.m.").

41).[14] Knowles failure to proffer what witnesses would have said and what an adequate investigation would have shown are fatal to Claims 1(a), 1(b), 1(e), and 1(i) because he failed to establish the prejudice component of *Strickland*.

In Claim 1(c), Knowles alleges that counsel failed to challenge the fact that Knowles had the opportunity to commit arson. In Claim 1(d) Knowles alleges, in a conclusory manner, that counsel was ineffective because she denied him "a defense." Dkt. No. 1 at 5. He argues that "counsel failed to present many facts that would have vindicated [Knowles] of alleged crimes," which is preceded by his allegation that the Commonwealth did not prove the premeditation element of first-degree murder and that counsel "failed to properly challenge this element in closing argument." *Id.* at 17. Claim 1(h) alleged that counsel failed to challenge the lack of motive. Due to the overlapping nature of each claim, the Court will address the allegations together.

It is evident from a review of the record that trial counsel's strategy was to provide reasonable doubt that Knowles (even though he was in possession of the victim's car, cell phone, and credit cards from 6:26 a.m. that morning until he was apprehended after fleeing from police later that day), was the perpetrator of the murder and arson. This strategy had several components: diminish the prejudice of the federal paperwork; portraying the investigation as inadequate; emphasizing the lack of motive or relationship between Knowles and the victim; and moving to strike and reduce the first-degree murder charge to second-degree murder.

---

[14] Knowles' federal petition references Lubin, citing Exhibits C-1 through C-5, Dkt. No. 1 at 53-71—but there is no sworn statement by Lubin attached. There is, however, a letter by trial counsel dated October 12, 2020, the day before trial commenced, that indicates October 12, 2020 was the first time Knowles had provided her with Lubin's name and that trial counsel had called Lubin that day. Counsel informed Knowles that Lubin was not an alibi witness because Lubin stated to trial counsel that Lubin had "no information on [Knowles] whereabouts from 12:00 a.m. until the time she spoke with Ashley Brown who told [Lubin that Knowles] had been arrested." *Id.* at 58. Again, this portion of his claim fails to establish *Strickland* prejudice. *See also supra* at note 13 (discussing colloquy with trial judge and resting without putting on any evidence).

18

During closing argument, trial counsel, referring to the testimony of the prosecution's witnesses, pointed out evidence that supported Knowles not being the perpetrator of the murder and arson. First, relying on Harlan's testimony about when the fire might have started and that the fire could have burned for 30 or 40 minutes, counsel used that evidence to point out that Knowles had left the area at 6:26 a.m. and went to North Carolina.[15]   The next point of evidence counsel incorporated into Knowles defense addressed the federal court documents found at the scene that summoned Knowles to court for a probation violation with an underlying conviction for carjacking. Trial counsel was successful in having those papers partially redacted, Tr. at 433-34, and trial counsel argued that people receive summonses all the time for innocuous things in an effort to diminish their evidentiary value. *Id.* at 829-30. Counsel's argument was a potentially effective point since all the jurors had received similar summonses for their jury duty in Knowles' case.  Counsel also noted that no fingerprints were recovered from the documents, *id.* at 830, 833, and that the forensic testing of the numerous items processed for fingerprints and DNA did not find Knowles "DNA, fingerprints, skin cells, nothing like that, . . . on any of those Certificates of Analysis," and Knowles fingerprint's and DNA were not found in the apartment. *Id.* at 832. The forensics personnel also did not find any gasoline (except for Knowles shoes, which he could have picked up by stepping in gas at a gas station) or blood on any of Knowles' clothes. *Id.* at 833. Counsel made each of these points to distance Knowles from the crimes of murder and arson.[16]

---

[15] The prosecutor responded to this point noting that Harlan had testified "he *could not* give an estimate of how long it burned because the fire itself—and you'll see from the pictures, the fire itself started in a few areas and smoldered." Tr. at 842 (emphasis added). The prosecutor's point was supported by Harlan's testimony. After the "30 or 40 minutes" estimate, Harlan's testimony continued stating that determining when the fire started "depends on how much oxygen was available. *It's really hard to determine exactly in that situation.*" *Id.* at 229 (emphasis added).

[16] The federal court documents were potentially prejudicial because the unredacted version of the documents indicated Knowles had been convicted in federal court for carjacking, he was on probation, and it was alleged that he had violated his probation. Trial counsel filed a motion *in limine* seeking "to bar the Commonwealth and its witnesses, during any phase of this trial, from referring to or introducing any evidence that the Defendant's federal probation

Trial counsel admitted the indisputable (that Knowles took the car, the cell phone and the credit card), but then she listed several points attacking the investigation in support of her reasonable doubt argument pointing out matters that the detectives did not investigate, the prosecution's failure to provide a motive or establish any sort of relationship between Knowles and the victim, the failure to record the interview with Knowles, the failure of the audio function on the officers' body cameras, and lack of evidence that any neighbors of the victim were interviewed. *Id.* at 837-39.[17] Counsel's actions were not unreasonable and the record refutes Knowles' allegation that counsel did not try to provide the jury with a reasonable doubt as to whether Knowles had the opportunity to commit the crimes.

The record establishes that trial counsel had a strategy prior to trial that she implemented during the course of the trial. Simply because her strategy was unsuccessful does not establish ineffective assistance of counsel, much less that she failed to attack the prosecution's evidence. The reasonableness of counsel's strategic decision is not lessened by the fact that the strategy ultimately failed. *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*) (holding "'it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance.' Nor does the fact that a particular defense ultimately

---

paperwork was located at the scene of the homicide." R. at 146. As noted, counsel was successful in having several portions of potential prejudice redacted. R. at 556-62.

[17] In support of her attack on the investigation, counsel noted, *inter alia*, that the police had failed to search Gillard's home in North Carolina for Knowles' discarded clothes or other evidence of the murder that would have been present had Knowles committed the offenses. Tr. at 822-23. Counsel reminded the jury that the police did not use dashboard cameras, had failed to record some interviews, and that some of their videos did not have audio. *Id.* at 828, 830-31. Counsel hinted that the Commonwealth did not admit the jail calls because the Commonwealth did not want the jury to hear them. *Id.* at 826-27. *Harrington v. Richter*, 562 U.S. 86, 109 (2011) ("[t]o support a defense argument that the prosecution has not proved its case[,] it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."); *see also Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) (A "common trial tactic of defense lawyers is to discredit the caliber of the investigation."); *see, e.g., Valentino v. Clarke*, 972 F.3d 560, 582 (4th Cir. 2020) (holding that defense counsel's argument that "the absence of extensive forensic testing" indicated "that the Commonwealth was not committed to a 'full and fair investigation'" and "that detectives were 'more interested in finding evidence to convict than in giving the full and fair investigation that this case required," was a strategy that was "within the realm of reasonable defense tactics.").

proved to be unsuccessful demonstrate ineffectiveness.") (quoting *Waters v. Thomas*, 46 F.3d 1506, 1522 (11th Cir. 1995) (en banc)); *see also Williams v. Kelly*, 816 F.2d 939, 940 (4th Cir. 1987) ("Counsel is not ineffective merely because [s]he overlooks one [trial] strategy while vigilantly pursuing another."). Accordingly, Knowles has failed to meet either prong of the *Strickland* standard and therefore cannot establish cause to excuse his default.

> B.    *Claims 1(f) and 1(g)*

Claims 1(f) and 1(g) each concern trial counsel's knowledge of and use of the DNA evidence found on the victim. Dkt. No. 1 at 18-20, 30-32, 35. Although part of the investigation and trial strategy, the Court addresses them separately because they comprise a discrete aspect of the trial.

Prior to trial, counsel stated on the record that she had provided all discovery to Knowles. Tr. at 576, 577. The record contains numerous discovery response by the prosecution, which included several certificates of analysis. Counsel was aware of the DNA evidence and she used the absence of DNA evidence implicating Knowles as part of the defense. Knowles did address the trial court on the discovery, but the only two specific points of discovery that Knowles brought to the trial court's attention pre-trial were "the time of death" and "the tracking of the vehicle." *Id.* at 576. The victim was dead at the time the firefighters arrived at approximately 8:15 a.m. on June 18, 2019, and no one testified as to the time of death. Furthermore, the parties entered into a stipulation that the victim "was declared dead at 8:20 a.m. on June 18, 2019." R. at 223. The stipulation also establishes trial counsel was aware of the "tracking" of the victim's vehicle.[18]

---

[18] The stipulation also included the victim's cell phone records, which included "all stored call, service data, and cellular tower location information for" the victim's cell phone "for June 1, 2019 through June 19, 2019," and that all "such records are true and accurate copies of the records." *Id.* As to the tracking of the victim's vehicle, that report established that the victim's car went from Norfolk to Grandy, North Carolina and back to Virginia on June 18, 2019. The report, Commonwealth Ex. No. 91, showed the car's location from 9:06 a.m. that morning, in Grandy through 2:40 p.m. In between those two times, the car "pinged" its location in North Carolina until 2:29 when it returned to Virginia. R. at 257-58. All of this evidence came in without objection. In addition, it was not disputed at

The record establishes that trial counsel received a discovery response from the prosecutor on January 27, 2020 that included the Certificate of Analysis detailing the results of the forensic analysis of the penile swab as well as other evidence. Dkt. No. 20-1 at 37-56 (January 27, 2020 Discovery Response, Nov. 26, 2019 Certificate of Analysis for Items 18-30, 32-38, and 140).[19] The certificate of analysis noted, "DNA types different from D. Brooks and of no value were developed. Due to the limited information obtained, these types are not suitable for comparison, searching against the Virginia DNA Data Bank or submission to the National DNA Data Bank." *Id.* at 44. Thus, the record demonstrates that counsel was informed prior to trial that DNA was discovered on the victim's penis that did not match the victim. Moreover, the record demonstrates that the DNA sample, which was "of no value" was "not suitable for comparison." *Id.* It was not unreasonable for counsel to not seek further testing on an item that was "not suitable for comparison." Based upon this, trial counsel could use the DNA results as evidence as part of the strategy to distance Knowles from the crime scene.

While the DNA Certificate of Analysis alerted counsel to the presence of a third party's DNA, it also stated that it was not suitable for comparison. The Fourth Circuit has observed that there is an "upside" to the absence of extensive forensic testing that can allow defense counsel "to argue that the Commonwealth was not committed to a 'full and fair investigation.'" *Valentino*, 972 F.3d at 582. Further, in a case such as this, where there is substantial circumstantial evidence that indicates Knowles was at the crime scene, counsel could conclude that additional forensic testing

---

trial that the victim's car went to Grandy, North Carolina that morning and returned to Virginia that afternoon when the high speed car chase occurred.

[19] The prosecution provided several discovery responses, which included, but were not limited to, the 911 calls, surveillance videos from the McDonalds Knowles stopped at in North Carolina, the data from the two cell phones recovered, the Chesapeake Expressway records, the video/still images from Picadilly Street on June 18, 2019, and the tracking evidence was disclosed in the prosecution's Fourth Supplemental response to discovery in that each of the witnesses names were disclosed. R. at 53, 95.

presented "downsides risks," because additional forensic testing could have undermined her use of the absence of DNA to distance Knowles from the crime scene, as well as her attack on the thoroughness of the investigation.

Knowles has failed to demonstrate that his counsel acted unreasonably in not pursuing DNA testing as part of her investigations, and Knowles has not provided any evidence that the outcome would have changed had trial counsel sought the further testing and this portion of his DNA claims. Consequently, trial counsel did not act unreasonably for failing to seek a continuance to seek further testing of the DNA evidence, Dkt. No. 1 at 18-20, because trial counsel knew before trial that the DNA was not suitable comparison.  Thus, here too, Knowles has failed to establish either prong of the *Strickland* standard such that he could demonstrate cause to excuse his default.

*       *       *

In sum, with respect to Claims 1(a) through 1(i), Knowles has failed to establish a claim of ineffective assistance of counsel under either prong of *Strickland,* which means that he has failed to establish his claims are substantial under *Martinez*. Claims 1(a) through 1(i) are defaulted and will be dismissed.

### *C. Claim 2*

In Claim 2, Knowles contends that trial counsel unreasonably failed to call his brother Jarard and Lubin. Dkt. No. 1 at 6-7.  In this regard, he alleges that each would have testified that Knowles had access to each of their vehicles (which he argues goes to motive) and that Lubin would have testified that Knowles had access to the victim's vehicle as well. *Id.* at 25-26, 28. The Court has already addressed Jarard Knowles' unsworn statements and the absence of an affidavit from Lubin, as well as the colloquy that occurred before trial in which the fact that trial counsel had interviewed Lubin and determined she was not an alibi witness. *See, supra* at notes 13, 14. For

the reasons stated above, Claim 2 fails to establish an unreasonable act or omission of counsel or prejudice under *Strickland*.  Thus, Claim 2 is not substantial, fails to establish cause to excuse default, and it will be dismissed.

    *D. Claim 3*[20]

    In Claim 3, Knowles alleges that his rights were violated when the DNA recovered from the penile swab of the victim was not disclosed to his attorney or to him prior to trial and that his rights were violated when the penile swab DNA was not tested against persons of interest. Dkt. No. 1 at 3-4, 8, 18-20, 30-32, 35. Knowles' claims have no basis in fact. As noted above, the Commonwealth provided notice of the DNA results in its January 27, 2020 discovery response, which included the Certificate of Analysis detailing the results of the forensic analysis of the penile swab as well as other evidence. Dkt. 21-2 at 3-5; *see also* R. at 32-51. The Certificate of Analysis noted, "DNA types different from D. Brooks and of no value were developed. Due to the limited information obtained, these types are not suitable for comparison, searching against the Virginia DNA Data Bank or submission to the National DNA Data Bank." Dkt. 21-2 at 5. Thus, the record demonstrates that counsel was informed prior to trial that DNA was discovered on the victim's penis, that the DNA did not match the victim, and that the DNA sample was "of no value" was "not suitable for comparison." *Id.* Accordingly, Knowles' Claim 3 fails to establish an unreasonable act or omission of counsel or prejudice under *Strickland*. Claim 3 is not substantial, there is no cause to excuse default, and it will be dismissed.

---

[20] Claims 3 and 4 also cannot qualify for consideration under the narrow exception in *Martinez* because neither alleges ineffective assistance of trial counsel. Although Claims 3 and 4 are defaulted, the Court finds in the alternative that each claim has no merit.

*E. Claim 4*

Claim 4 alleges Knowles is entitled to federal habeas corpus relief because he was not provided an attorney and did not have access to a law library while assembling his "original," *i.e.*, state habeas corpus petition. Dkt. No. 1 at 9. His claim has no merit.

"It is black letter law that a federal court may grant habeas relief 'only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998) (quoting 28 U.S.C. § 2254(a)). Claims of error in a state post-conviction proceeding cannot serve as a basis for federal habeas relief. *See Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988); *accord Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (petitioner not entitled to federal habeas relief on assignment of error relating to post-conviction proceedings because such claim represents "an attack on a proceeding collateral to detention and not to the detention itself"); *see also United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006) ("due process challenges to post-conviction procedures fail to state constitutional claims cognizable in a federal habeas corpus proceeding"). Moreover, "there is no constitutional right to an attorney in in state post-conviction proceedings." *Smith v. Angelone*, 111 F.3d 1126, 1133 (4th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1990) (a habeas petitioner has no constitutional right to counsel). In the same vein, there is no "right [to counsel] in his state habeas appeal." *Smith*, 111 F.3d at 1133 (*Wise*, 982 F.2d at 145). Thus, Knowles "had no right to counsel (effective or otherwise) on state habeas, and cannot claim ineffective assistance of state habeas counsel . . . ." *Id.* Accordingly, Claim 4 will be dismissed.

Knowles failed to establish cause to excuse his defaults. Consequently, all of his claims are barred from federal review and his petition will be dismissed with prejudice.

*F. Sufficiency and Actual Innocence*

Knowles petition and pleadings are often unclear as to the nature of the claim or argument they contain. To the extent that Knowles petition could be construed as alleging that the evidence was not sufficient to sustain his conviction for first-degree murder and arson, that claim has no merit.[21] Since the claim of sufficiency was raised on direct appeal and was addressed on the merits and review is governed by AEDPA. The AEDPA standard requires federal courts to give deference to the state court's merits decision unless the decision was (1) contrary to, or an unreasonable application of, a clearly established United States Supreme Court decision, or (2) based on an unreasonable determination of facts "in light of the record before the state court." *Harrington*, 562 U.S. at 100; *see* 28 U.S.C. § 2254(d)(2). Under 28 U.S.C. § 2254(e)(1), a federal court must presume a state court's determination of facts is correct unless rebutted by clear and convincing evidence. *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) (factual issue determined by state court "shall be presumed to be correct"); *Lenz v. Washington*, 444 F.3d 295, 299 (4th Cir. 2006) ("[t]he required deference encompasses both the state court's legal conclusions and its factual findings"); *see also Wood v. Allen*, 558 U.S. 290, 300 (2010). ("a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance"); *Green v. Johnson*, 515 F.3d 290, 299 (4th Cir. 2008) ("federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence").

---

[21] Other than the sufficiency claim Knowles argued on direct appeal, any other sufficiency arguments are defaulted. *See Justus v. Murray*, 897 F.2d 709, 711 (4th Cir. 1990) (affirming district court's finding that habeas claim "concerning the sufficiency of the evidence" supporting petitioner's death sentence was procedurally defaulted under rule of *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1978), because it was not raised on direct appeal); *Kinnard v. Kelly*, No. 1:09cv1115, 2010 U.S. Dist. LEXIS 157175, *3, 5-7 (E.D. Va., Aug. 24, 2010) (finding sufficiency of the evidence claim had been defaulted on direct appeal, and was therefore simultaneously exhausted and defaulted and the default barred federal review), *appeal dismissed*, 411 F. App'x 628 (4th Cir. 2011).

26

A state court's decision constitutes an unreasonable application of clearly established federal law under § 2254(d)(1) when a state court correctly identifies the "governing legal principle . . . but unreasonably applies that principle to the facts of the . . . case." *Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014) (citation omitted).[22] In making this assessment, federal courts "look to whether the state court's application of law was objectively unreasonable and not simply whether the state court applied the law incorrectly." *Id.* at 238-39 (citation omitted).

> [T]he United States Supreme Court has increasingly cautioned, AEDPA significantly constrains our review of state court decisions on federal constitutional claims. We are not at liberty to substitute our judgment for that of the state court on matters of federal constitutional law, even if we believe the state court decision was incorrect. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was *unreasonable* — a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (emphasis added); *see also Harrington v. Richter*, 562 U.S. 86 (2011). The state court decision may be deemed unreasonable "only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents.'" *Nevada v. Jackson*, [569 U.S. 505, 508-09] (2013) (per curiam) (quoting *Harrington*, [562 U.S. at 102].

*Hurst v. Joyner*, 757 F.3d 389, 394 (4th Cir. 2014).

Under AEDPA, sufficiency claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). As the Supreme Court of the United States explained in *Coleman*:

> First, on direct appeal, "it is the responsibility of the [trial court sitting as fact-finder]—not the [appellate] court—to decide what conclusions should be drawn

---

[22] "Only holdings of the Supreme Court issued by the time of the relevant state court decision, and not circuit precedent, can form the basis for habeas relief under Section 2254(d)(1)." *Dodson v. Ballard*, 800 F. App'x. 171, 176 (4th Cir. 2020) (citing *Parker v. Matthews*, 567 U.S. 37, 48-49, (2012); *Barnes*, 751 F.3d at 239). The federal court reviews the "ultimate decision" of the state court, not the specific contents of its reasoning or opinion. *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). A state court need not articulate, or even know, the clearly established Supreme Court law, so long as its reasoning and decision do not contradict such law. *See Lenz*, 444 F.3d at 307.

In addition, "[w]hen a state appellate court summarily affirms a reasoned lower-court decision, or refuses a petition for review," *Ylst* directs the federal habeas court to "'look through' the unexplained affirmance to examine the 'last reasoned decision' on the claim, assuming that the summary appellate decision rests on the same ground." *Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517, 525-26 (4th Cir. 2016) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, at 803-04, 806 (2001)). In Knowles' case, that is the decision of the Virginia Court of Appeals.

from evidence admitted at trial. A reviewing court may set aside the [trial court's] verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the [trial court]." *Cavazos v. Smith*, 565 U. S. 1, 2 (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. 766, 773 (2010))

*Coleman*, 566 U.S. at 651.[23]

The evidence summarized by the Court of Appeals of Virginia, *supra* at 2-5, establishes

that the evidence was sufficient to sustain Knowles convictions for first-degree murder and arson.

The Court of Appeals of Virginia analyzed that evidence and found the evidence sufficient.

"Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). Such factors may include "the brutality of an attack . . . [and] efforts to avoid detection." *Id.* at 655-56.

Appellant argues that the circumstantial evidence "only proved that [a]ppellant and the victim knew each other" and that the killing "could have arisen from a situation involving heat of passion." We disagree. Brooks, who sustained multiple blows of blunt force trauma to his head, was found dead in his apartment. Three fires had been set inside the apartment, but they were only smoldering when firefighters arrived. Harlan opined that the fires were incendiary in origin, but he could not determine when they were set. Medical evidence showed that Brooks was killed before the fires were started, supporting the conclusion that the same person was responsible for both the murder and arson. Gasoline was found on the carpet in the home, on the futon where Brooks's body was located, in a bleach bottle in the bedroom, and, subsequently and significantly, on appellant's shoe at the time of his arrest. The apartment was in disarray and appeared to have been ransacked.

Notwithstanding the absence of evidence of appellant's DNA or fingerprints in Brooks's apartment or on the other evidence collected by the police, the

---

[23] In addition, on federal habeas review the *Jackson v. Virginia*, 443 U.S. 307, 316, 319 (1979) standard requires a federal court to view "the evidence in the light most favorable to the prosecution," to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the state court's factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *Pope v. Netherland*, 113 F.3d 1364, 1367 (4th Cir. 1997) (citation omitted). In reviewing the sufficiency of the evidence, "federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (citation omitted). Indeed, "to overturn a state court's credibility judgments, the state court's error must be stark and clear." *Id. See also United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983) (holding that federal habeas courts, when making a sufficiency-of-the-evidence determination, do not weigh the evidence or review the credibility of witnesses).

Commonwealth's evidence, when considered together, placed appellant in Brooks's apartment and showed that he stole Brooks's car, cell phone, and personal items, and drove to North Carolina to avoid detection. The recovery of appellant's federal court document in Brooks's apartment connected appellant to the crime scene. At about 6:30 a.m. on June 18, 2019, Brooks's vehicle was recorded traveling away from Brooks's Picadilly Street apartment. At that time, Brooks's phone, which he always kept with him, was with the moving vehicle. The evidence proved that Brooks's Toyota and his cell phone traveled with appellant to Gillard's North Carolina home. Appellant remained there for several hours. The evidence further suggests that appellant either disabled or discarded Brooks's phone before leaving Grandy, North Carolina.

The police discovered that appellant was returning to Virginia from North Carolina in Brooks's car, and a high-speed chase, ending in a collision, followed. "Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such . . . . Flight, by its very nature is not 'going about one's business'; in fact, it is just the opposite." *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). The police apprehended appellant, who apparently was injured in the car crash, hiding in the woods. Some of Brooks's debit cards were in appellant's pocket, and the key to Brooks's apartment was in the front seat of the abandoned car. Appellant falsely claimed that he had bought the car that day, had not left Norfolk, and had not traveled to North Carolina. Moreover, in the jail call, appellant admitted that he knew the victim in the case and had been to his home, contrary to what appellant told the police. Considering all of these facts and circumstances collectively, a reasonable finder of fact could conclude beyond a reasonable doubt that appellant killed Brooks with premeditation and malice, that he set fire to Brooks's home afterward, and that he was guilty of first-degree murder and arson.

Dkt. No. 20-3 at 19-21. The Court of Appeals of Virginia's decision affirming the sufficiency of the evidence was not contrary to, or an unreasonable application of, a clearly established Supreme Court decision, or (2) based on an unreasonable determination of facts "in light of the record before the state court." *Harrington*, 562 U.S. at 100.

To the extent Knowles' petition could be construed as asserting that he is actually innocent, such a claim has no merit. "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). However, "claims of actual innocence are rarely successful," *Schlup v. Delo*, 513 U.S. 298, 324 (1995), and "should not be

granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998). The standard of review for demonstrating innocence under *Schlup* is a demanding one. It requires that "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316).

To prevail on an actual innocence claim, a petitioner must present new evidence showing "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327 (emphasis added). The evidence Knowles proffers, however, is not "new reliable evidence" demonstrating a colorable claim of actual innocence. *Coleman*, 501 U.S. at 730; *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010). Instead, it was evidence that he knew about before trial; and that he and his attorney discussed during trial (in private) and then rested their case without putting on any evidence. Furthermore, the unsworn affidavit of his brother and the absence of an affidavit from Lubin do not demonstrate a colorable claim of actual innocence. The petition will be dismissed.

**V. Conclusion**[24]

For the foregoing reasons, respondent's Motion to Dismiss, Dkt. No. 18, will be granted, and the petition will be dismissed by an order to be issued alongside this Memorandum Opinion.[25]

Entered this 28th day of July, 2025

Alexandria, Virginia

/s/

Rossie D. Alston, Jr.
United States District Judge

---

[24] Petitioner's "Motion to Deny Request for Extension of Time to Respond to Petition," Dkt. No. 13, is denied as moot. His "Affidavit *in Forma Pauperis* to Obtain Trial Records," Dkt. No. 15, to obtain transcripts from his preliminary hearing, trial and unnamed motions, is denied for several reasons. First, his state and federal pleadings demonstrate that he has access to the requested transcripts. Dkt. No. 1 at 42-45; 46 (referencing preliminary hearing transcript); 51-52, 70-71; Dkt. No. 5 at 16-17. Knowles also attached portions of the transcripts to or referenced them in his state court pleadings to his state habeas petition. Habeas Record at 21-24, 27 (referencing preliminary hearing transcript); 32-34. Second, the respondent provided Knowles with the transcripts he referenced in his pleadings, Dkt. Nos. 20-1 at 57-87, and Knowles never alerted the Court that he needed any other portions of the transcripts to respond. Lastly, Knowles never alleged a particularized need for any other portion of the transcripts and has submitted a response to the motion to dismiss. Finally, the "Motion to Grant Habeas Relief and Award New Trial,: Dkt. No. 25, is denied.

[25] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.

31